Filed 4/21/21 M.L. v. Super. Ct. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Juvenile court, rule 8.1115(a), prohibits juvenile courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| M.L., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF SANTA CLARA COUNTY, <br><br> Respondent; <br> _____ <br> SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, <br><br> Real Party in Interest. | H048951 <br> (Santa Clara County Super. Ct. No. 18JD025518) |

## I.   INTRODUCTION

On December 7, 2018, the Santa Clara County Department of Family and Children's Services (Department) filed separate petitions under Welfare and Institutions Code section 300[1] concerning the minor, E.L. (born in February 2018). Petitioner M.L. is the minor's father. R.L. is the minor's mother.[2] The minor was removed from Mother's

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] The Department filed a separate petition involving E.L.'s half-brother, T.G., seeking to declare him a dependent child under section 300, subdivisions (b)(1) and (c).

care in January 2019 due to prior instances of domestic violence between Mother and Father, that reportedly occurred between March 2016 and August 2018. The minor has been a dependent of the juvenile court since May 2019.[3]

After a lengthy contested proceeding that was a combined 12-month and 18-month review hearing, the juvenile court on December 1, 2020, terminated Father's (as well as Mother's) reunification services. The court found that there would be a substantial risk of detriment if the minor were returned to the care of Father; Father had "not exhibited adequate insight and accountability regarding his actions," including his denial of a June 13, 2020 incident of domestic violence involving Mother and him; and Father had failed to show substantial progress in the substance abuse component of his case plan. The juvenile court set a selection and implementation hearing pursuant to section 366.26 for March 25, 2021 (hereafter, the 366.26 hearing).

Father seeks an extraordinary writ challenging the court's order terminating services and setting a 366.26 hearing. (Cal. Rules of Court, rules 8.452, 8.456.)[4] Additionally, he seeks a stay of the 366.26 hearing. Father asserts that there was not substantial evidence to support the juvenile court's finding that returning the minor to Father's care would create a substantial risk of harm to the minor's safety, protection, and physical and emotional well-being. He argues further that the juvenile court denied him

---

(R.L. is T.G.'s mother; M.L. is not the father.) That petition, as later amended, was sustained by the court on May 3, 2019. It is not at issue here.

[3] Mother and Father filed separate appeals from the juvenile court's May 2019 jurisdiction and disposition order finding the minor to be a dependent child pursuant to section 300, subdivisions (b), (c), and (j). We affirmed that order in *In re T.G., et al.*, (March 10, 2021, H046914) [nonpub. opn.] (*In re T.G.*).

[4] All further rule references are to the California Rules of Court.

Father filed timely his notice of intention to file a writ petition pursuant to rule 8.450(e). He did not, however, timely file his writ petition in accordance with rule 8.452(c)(1). In the interests of justice, this court granted Father leave to file his untimely petition.

due process by conditioning his proposed testimony upon his counsel first making an offer of proof.

Mother filed a separate writ petition challenging the termination of services and the setting of a 366.26 hearing. She also sought an immediate stay of the 366.26 hearing. (Rules 8.452(f), 8.456.) On March 24, 2021, this court issued an order staying the 366.26 hearing, with reunification services to be provided to Mother during the stay. On April 6, 2021, this court granted Mother's petition for extraordinary writ directing the respondent court to vacate its prior order terminating services and setting a 366.26 hearing, and directing that the court enter a new and different order finding that reasonable services were not provided or offered to Mother and granting reunification services to Mother for an additional period of at least six months. (See *R.L. v. Superior Court* (Apr. 6, 2021, H048650 [nonpub. opn.] (*R.L.*).)

We conclude here that the juvenile court did not err in terminating Father's services. We will therefore deny Father's petition for extraordinary writ.

## II. FACTUAL AND PROCEDURAL BACKGROUND[5]

### A. Initial Proceedings

In March 2018 (nine months before the petition's filing), the San Jose Police Department forwarded police reports concerning two domestic violence incidents involving Mother and Father. On March 12, Father was arrested after he punched and slapped Mother in the face and punched her in the stomach while she was holding their newborn baby, E.L. On March 21, Mother was arrested after she punched Father in the face. The minor was present in the vehicle when the incident occurred. During the investigation of that incident, Mother told the police that Father was "addicted to cocaine

---

[5] Because of Mother's prior appeal and petition for extraordinary writ, we are very familiar with the facts involved in this proceeding. We take judicial notice of the opinions in *In re T.G.*, *supra*, H046914, and *R.L.*, *supra*, H048650, and we incorporate by reference the underlying facts and procedural history recited in those opinions. Additionally, we have taken judicial notice herein of the record filed in *R.L.*

3

and [she had] found several straws in the past in her apartment." Mother also said that Father had been fired because of his drug use, and that because of drug testing as a commercial driver, Father had submitted urine samples of others to pass drug tests. The Department later learned of a third incident involving the police in which Father, on August 30, 2018, grabbed mother by the neck and by her hair and pushed her into the window of a vehicle multiple times. Father's contact was in violation of a criminal protective order.

On December 7, 2018, the Department filed a petition seeking to declare the minor a dependent child under section 300, subdivisions (b)(1), (c), and (j). The minor was not removed from Mother's custody at that time. After an incident in which Mother and Father—in violation of a protective order—reportedly stayed with Father's sister for three days in January 2019 (with the minor and her brother, T.G. present), consuming alcohol to the point of intoxication during the entire stay, the Department, by a protective custody warrant, sought and obtained the removal of the minor from Mother's care. Father, who was inside the home when the warrant was served on Mother, was in violation of the criminal protective order and was arrested. The minor was placed in the care of her maternal grandparents. Mother and Father received frequent visitation with the minor.

Shortly before the Department sought removal of the minor, on January 11, 2019, Father agreed to a voluntary drug test; the results yielded a faint line for cocaine. Father then attempted to withdraw his consent to testing. He denied cocaine use.

The Department submitted reports in connection with the jurisdiction/disposition hearing. The reports included discussion of 14 reported incidents of domestic violence between March 2016 and August 2019. Father was the aggressor in eight of the incidents, and Mother was the aggressor in six of them; all but three of the reported incidents involved physical violence. Father tested negative for drugs from February to April 2019; he missed two tests in February, and two tests in April.

4

At the contested jurisdiction/disposition hearing, Father testified that he had never used physical violence against Mother or had destroyed any of her property. He denied that he had ever violated the three-year criminal protective order obtained by Mother that was effective until 2021. Father also testified that he had never used controlled substances, including cocaine. His occupation was commercial driver and, as such, he was required to submit to drug and alcohol testing. Mother testified that she had been a victim of domestic violence for "one short period" of time during her relationship with Father. She denied having ever perpetrated physical violence upon him. Of the incidents of physical domestic violence by Father that she had previously reported, Mother testified that only one had occurred (the incident on March 12, 2018). And she testified that she had lied to the police about Father, while they were driving, having strangled her, or having grabbed her by the hair and twice slamming her head into the window.

After a lengthy evidentiary hearing, on May 6, 2019, the juvenile court found that the minor was a child described under section 300, subdivisions (b), (c), and (j). In its disposition order, the court found by clear and convincing evidence that the minor's welfare required that she be removed from the physical custody of Mother, because there was a substantial risk to the minors' physical health, safety, protection, or physical or emotional well-being that could not be protected without such removal. The court found further by clear and convincing evidence that placement of the minor with Father, as the previously noncustodial parent, would be detrimental to her safety, protection, or physical or emotional well-being. In reaching its decision, the court concluded that there was "overwhelming evidence" of all different forms of domestic violence between Mother and Father, and that both parties had "significantly minimize[d] the amount of domestic violence that was in this case." The court ordered reunification services for Mother and Father, including visitation with the minor. Father's case plan included completion of a parenting orientation class, a parent class (nurturing fathers), a program of counseling or

5

psychotherapy, random alcohol/drug testing, attendance and completion of a 12-step program, a substance abuse assessment, and a domestic violence assessment.

## B. Contested Six-Month Review Hearing

Prior to the six-month review hearing, the Department reported that Father had (1) completed a parent orientation class in February 2019; (2) completed in November 2019 a 10-week nurturing fathers course; (3) completed a substance use assessment in July 2019, with an assessment that no substance abuse treatment was recommended; (4) commenced therapy services in March 2019 with an indication that he had been "consistently engaged with his treatment goal"; (5) reported regularly attending Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings; (6) received eight negative drug tests since July 15, 2019, but had missed seven tests, and had received negative tests in November and December; (7) completed (with Mother) a domestic violence assessment; and (8) begun attending a batterer's intervention program in November 2019 and had attended five sessions. The professional conducting the domestic violence assessment concluded that Father was "the primary aggressor and [M]other demonstrated reactive violence." The assessor stated that "the lethality of the violence by both parents [was] very concerning."[6] The assessor recommended that both parents receive substance abuse testing and complete a 52-week batterer's intervention course.

The Department reported that Father began unsupervised visits with the minor in late October 2019. In an addendum report dated November 25, 2019, the Department presented plans for multiple overnight unsupervised visits between Father and the minor.

---

[6] Contrary to his previous denials to the Department and his testimony at the contested jurisdiction/disposition hearing, Father admitted during the July 2019 assessment that both Mother and he had engaged in physical domestic violence with the other; Father indicated that they had "both pushed the other and ha[d] both choked/strangled the other"; and had "both caused bruises."

6

In that report, the Department recommended that Mother's services be terminated and that Father and the minor receive family maintenance services.

At the initial six-month review hearing on December 2, 2019, Mother indicated that she contested the Department's recommendation. The court set the matter for a contested proceeding, and it ordered that the minor transition to Father's care on a temporary basis with family maintenance services.

In its January 2020 addendum report, the Department advised that as of early December, the minor "was fully transitioning home with [F]ather and she appeared to be adjusting well with the placement and other family members living in the home."

The contested six-month review hearing commenced on January 7, 2020. During the second day, the Department requested a continuance based upon it having been advised that day that Father had been arrested in November 2019. The Department requested time to assess whether it needed to modify its original recommendations. It advised that it was returning Father's visits to a supervised basis and would be temporarily placing the minor with paternal relatives. The Department also requested that drug testing for Father be increased from once to three time a week, and that he attend AA/NA meetings once a week. The juvenile court granted the Department's requests.

When the hearing resumed on February 13, 2020, the Department stated that it had changed its recommendations; it requested that the court order further reunification services for Mother and Father. During the hearing, the Department presented evidence that Father had been arrested for driving under the influence of drugs on November 10, 2019. After the assigned caseworker, Anh Nguyen, learned about the November 2019 arrest on January 17, 2020, she asked Father about it and he admitted that he had used drugs and had driven under the influence. Father also admitted to Nguyen that he had permitted Mother to have an unsupervised visit with the minor in October 2019. And Father admitted to Nguyen that he had falsified AA/NA meeting

7

attendance slips. Testimony and argument on the contested hearing concluded on February 14, 2020. The juvenile court announced its decision on February 20, 2020. The court found that returning the minor to the care of either Mother or Father would create a substantial risk of detriment to the child's safety, protection, and physical and emotional well-being. The court noted further that it "truly [viewed] this case as one in which both parents ha[d] the potential to succeed in reunifying with [the minor] in the foreseeable future."

The juvenile court ordered continued reunification services for both parents. The order included that Father receive drug testing twice a week, receive counseling, attend AA/NA meetings at least twice a week, and complete a 52-week batterer's intervention program. Father was to receive supervised visitation with the minor of a minimum of three times a week for two hours a visit. The court set the 12-month review hearing for March 17, 2020, because of the amount of time that had passed since the court took jurisdiction in May 2019.

### C.     Combined 12-Month and 18-Month Review Hearing

#### 1.     *Scheduling*

Due to the COVID-19 global pandemic, on March 4, 2020, Governor Gavin Newsom declared that California was in a state of emergency[7] and issued a subsequent stay-at-home order on March 19, 2020.[8] The Judicial Council of California issued

---

[7] Executive Department State of California Proclamation of a State of Emergency <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf> [as of Apr. 21, 2021], archived at < https//perma.cc/Q9FN-EJED>.

[8] Executive Department State of California Executive Order N-33-20 <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf> [as of Apr. 21, 2021], archived at < https//perma.cc/M563-ERYW>.

Emergency Rule 6(c)(6) on April 6, 2020, authorizing continuances for juvenile dependency hearings due to the pandemic.[9]

The original 12-month review hearing scheduled for March 2020 was continued three times and was eventually set for July 7, 2020. On July 7, the Department requested a continuance so it could reevaluate its recommendations based upon a domestic violence incident between Mother and Father that had occurred on June 13 (discussed in detail, *post*).[10] Because the case had extended beyond 18 months from the time the minor had been taken into protective custody, the court set the matter for a combined 12-month and 18-month review hearing on July 31, 2020. Due to its contested nature, the hearing ultimately commenced on September 28, 2020.

### 2. *Department's Reports*

The Department filed two reports between March and June 2020 in connection with the 12-month review hearing. Between July 7 and the commencement of the review hearing on September 28, the Department filed seven additional reports. The Department in its reports consistently recommended that the juvenile court terminate Mother's and Father's reunification services and set the matter for a 366.26 hearing.

---

[9] Judicial Council of California Amendments to the California Rules of Court <https://www.courts.ca.gov/documents/2020-04-06-rules-effective-04-06-2020.pdf> [as of Apr. 21, 2021], archived at <https//perma.cc/358N-92L4>.

[10] We acknowledge that Father repeatedly denied in interviews with the Department that there was in fact an incident on June 13, 2020 of domestic violence in which Father physically assaulted Mother. The juvenile court, however, concluded from the evidence that the domestic violence incident occurred. As we note, *infra*, this finding was supported by substantial evidence and, in deference to the juvenile court's role as factfinder, we will not reweigh the evidence or assess the credibility of witnesses. We will refer herein to this incident as the June 13 domestic violence incident or as the June 13 incident.

### a.    Minor's Placement

The minor was originally placed with the maternal grandparents. In mid-January 2020, the minor was placed with her paternal uncle and his family in San Jose. The minor had reportedly adjusted well to her new placement.

### b.    Father's Case Plan

The Department reported that Father had continued to participate in the 52-week batterer's intervention program, had completed 25 sessions, and he was actively engaged and participated in class. But on July 29, he was terminated from the program due to the June 13 domestic violence incident. He re-enrolled in the course. Father also continued to participate in individual therapy and had completed 24 sessions. It was reported that Father was motivated and was working toward behavior modification to avoid bad decisions and unhealthy relationships.

Father had been attending multiple AA/NA meetings per week (with the exception that he did not attend meetings between mid-March and early April), and his sponsor reported that Father was doing well. Father attended 16 AA/NA meetings in June and six meetings in July. Father produced screen shots showing attendance at three AA/NA meetings in August and six meetings in September. On September 16, Father reported that he had not been in contact with his sponsor.

Between February and late-June 2020, Father was drug testing regularly, and his tests had, with one exception, been negative. On June 22, Father tested positive for cocaine. Between June 29 and July 21, he tested negative on four occasions. Between June 29 and September 21, Father missed eight scheduled drug tests. On September 15, Father tested positive for cocaine.[11] Father had three negative drug tests in October and missed three tests that month. He missed a scheduled drug test on November 2.

---

[11] The Department received written confirmation from Dr. Aaron Brown, Scientific Director of Cordant Forensic Solutions, that neither of Father's positive drug tests (June 22 and September 15) was a false positive.

Father had his first unsupervised visit with the minor on March 7, 2020. Between April and June, the Department discussed with Father and Father's relatives, including the paternal uncle (caregiver) regarding transitioning Father into the home with a safety plan. Following the June 13 domestic violence incident, Father's visitation with the minor reverted to three times per week for two hours each visit, supervised by the Department.

### c.  June 13, 2020 Domestic Violence Incident

The Department was advised that at approximately 6:00 a.m. on June 13, Father left the house by car with the minor "and there was a high possibility that the child was transported without a car seat." It was reported that Father returned by car with the minor at approximately 8:20 a.m., dropping off the child and leaving immediately. The minor was dressed in her pajamas, had a soiled diaper, and looked exhausted. Father told the caregiver that the minor was crying because she had not wanted to leave the home of the paternal aunt.

Father initially told the Department he had taken the minor at approximately 6:00 a.m. to his sister's home. He later stated that he had left the home at 7:30 to walk in the neighborhood while attending his virtual AA/NA meeting. On June 17, Father told social worker Nguyen that he had left the home with the minor the morning of June 13 and had taken her to breakfast. He later told Nguyen that he had not taken the minor to breakfast, had not left with the child in his car, but had prepared a sandwich for her.

On June 13, Mother reported to the San Jose Police that Father and she were in his car proceeding northbound on Highway 85 that morning when Father, who was driving, punched her twice in the face. The police report indicated that Mother said that Father stopped the car, exited, and opened the passenger side door and pulled Mother out of the car by her hair.

Mother failed to attend her first in-person visit on June 13 with the minor and T.G. Mother told the social worker that day that she was filing a police report against Father.

11

The next day, mother reported to the Department that she had been involved in a car accident on June 13.

On June 17, Mother self-reported to the Department that at approximately 6:00 a.m. on June 13, she had an unauthorized visit with the minor and Father at the home of Father's cousin. Mother told the Department that after the visit, while Father was giving her a ride to her boyfriend's home, Father struck Mother in the face.

Social worker Nguyen learned through a detective with the Department that a domestic violence report had been prepared involving a June 13 incident in which Father had punched Mother twice in the face and pulled her out of the car by her hair. Father left before police arrived and a warrant for his arrest was issued. The Department asked Father to move out of the home where the minor was placed while the Department investigated the incident.

A separate investigation of the June 13 domestic violence incident was conducted by social worker Diane Hall with the Emergency Response division of the Department; Hall was not the social worker assigned to the dependency proceeding. Hall generated a lengthy report based upon her investigation.

The paternal uncle, D.L. (caregiver), advised Hall that when he and his partner awakened at about 8:00 a.m. on June 13, the minor was not in her bedroom. D.L. called Father, who said he was at his sister's house with the minor. Father returned within 20 minutes by car with the minor; D.L. believed the minor was transported without a car seat. Father quickly dropped off the minor, who was wearing pajamas and crying, and he then left. Father did not return home until 11:00 a.m. the next day. D.L. reported that the minor was exhausted and was nodding off as D.L. and his partner were getting her ready for the day. D.L. reported that Father later contacted him "to say that he took the child for a walk and did not leave with her in his vehicle, . . . inform[ing D.L.] that . . . it would be [Father's] word against [D.L.'s] word as to what took place."

12

Father told Hall that on June 13, the minor awakened at 6:30 to 7:00 a.m., and that he took her outside (in her pajamas) while he attended his virtual AA/NA meeting. He could not provide proof of his attendance at the meeting. Father said D.L. called him, and Father informed D.L. that he was outside; he brought the minor inside when the meeting ended at 8:30 a.m. Father said that he attended a virtual batterer's intervention class that morning (after the AA/NA meeting) that went from 9:00 to 11:00.[12] Father denied that he traveled with the minor anywhere in a car. He also denied that he took the minor to visit Mother, to the paternal aunt's home, or to a McDonald's. Father stated he had neither seen nor spoken with Mother.

Although Mother told Hall that her attorney had advised her not to speak with Hall because Mother had already self-reported the incident, Mother did discuss the incident briefly with Hall. Mother said that Father began calling her on June 12, and that because she had not seen the minor for three months because of the COVID-19 pandemic, she was vulnerable. Father picked her up at about 6:00 a.m. on June 13, and the minor was in the back seat in a car seat. He took Mother to an apartment she was unfamiliar with that may have been where Father's cousin lived. Mother stated that there were no verbal or physical altercations between her and Father in the minor's presence. She was not with Father when he returned the minor to the caregiver's home. The domestic violence occurred at approximately 9:30 a.m. after Father returned from the caregiver's home, and she contacted the police at approximately 10:00 a.m.

Hall concluded that the allegation of general neglect by Father was substantiated. Hall noted that, although Father had unsupervised overnight weekend visits, he had been instructed by social worker Nguyen not to transport the minor. He gave inconsistent accounts of what transpired, but he admitted at one point to Nguyen that he had

---

[12] The facilitator of the batterer's intervention course told Hall that Father had logged into the class on the morning of June 13, but she could not confirm whether he was continuously online for the entirety of the class.

transported the child in his car, and the caregiver witnessed him returning with the minor in his car to the home. Hall also concluded that the allegation of general neglect by Mother was substantiated because she was permitted only supervised visits and because she engaged with Father, with whom she had an extensive history of domestic violence.

In the months after June 13, Father repeatedly denied to the Department that the incident had occurred. On July 23, he told Nguyen that he had never left the house with the minor on June 13, had not seen or spoken with Mother, "and that [M]other lied about everything." On July 28, Father spoke to Nguyen and said he felt the Department had been disrespectful toward him because of "a bunch of lies" in the Department's report. He told Nguyen that she had never "asked him his side of the story." Father criticized Nguyen for not being "supportive transparent, and honest." Nguyen indicated in her report that Father had argued with her and "bec[a]me very offensive," resulting in her ending the conversation because Father made her feel "unsafe." On September 16, Father reiterated to Nguyen that his statement remained unchanged and that "[M]other had made[] up lies about him and that none of the allegations [*sic*] happened on 6/13/20."

### 3. *Combined 12-Month/18-Month Review Hearing*

The contested 12-month/18-month review hearing was held over four half-day sessions between September 28 and November 9, 2020. Both Father and Mother objected to the Department's recommendations that services be terminated and that the court set a 366.26 hearing. The court announced its decision on December 1. During the hearing, the court heard from a number of witnesses, including Anh Nguyen (social worker), Ross Matsushima (social worker's supervisor), Mother, and C.S. (Father's cousin).

### a. **Social Worker Anh Nguyen**

The social worker assigned to the case, Anh Nguyen, testified as an expert in risk assessment and child welfare services. Nguyen testified that there were a combination of factors that led the Department to change its recommendation from returning the minor to

14

Father with family maintenance services to the termination his reunification services. These factors included the June 13 domestic violence incident, Father's having missed a number of scheduled unsupervised visits, his having missed a number of AA.NA meetings, and Father's positive drug test results. Nguyen noted that there had been an additional positive drug test for cocaine in September, and Father had missed approximately seven or eight tests. Nguyen acknowledged on cross-examination that in an October 23, 2020 report from Father's batterer's intervention program, it was stated that Father was in full compliance with his program.

Mother initially told Nguyen that she had been in a car accident on June 13. Within days thereafter, Mother "self-report[ed]," telling Nguyen that there had been a domestic violence incident in which the police responded, and she had made a report. Nguyen testified that Mother had made different statements about the incident at different times.

### b.    Social Work Supervisor Ross Matsushima

Ross Matsushima, Nguyen's supervisor, testified as an expert in risk assessment and child welfare services, as well as in intimate partner violence.

Matsushima testified that the minor would be at risk if she were placed in Father's care. He based this opinion on Father's having been unable to address his substance abuse issues, including missed tests and positive tests, and his interpersonal violence issues. Matsushima testified that Father had "not been able to integrate what he's learning in his classes in his life and that unfortunately puts [the minor] at risk if [she were] returned to his care."[13]

### c.    R.L. (Mother)

Mother testified about the June 2020 domestic violence incident. Mother explained that Father had called her and offered to arrange an unsupervised visit with the

---

[13] Father's counsel did not cross-examine Matsushima.

15

minor. She said she knew it would be wrong to do so, but she had accepted the offer because she had not seen her daughter for three months. After the visit, when Father was driving Mother back to her car, they had gotten into an argument. Father punched Mother in the face twice while driving; he then stopped the car, came around to the passenger's side, and pulled her out of the car by her hair. The minor was not present during the incident. The San Jose Police responded, and Mother reported the incident.

Mother testified that she had initially told the social worker by e-mail that she had been in a car accident because she "was scared of the repercussions towards stating that [she] was a victim in another domestic violence incident." Within approximately three days, Mother reported to the social worker in a fairly lengthy telephone conversation that she had been a domestic violence victim in an incident with Father.

### d.      C.S. (Father's Cousin

C.S. is Father's cousin. She lives in San Jose. She was in her home on the morning of June 13. She did not see Mother or the minor that morning. She testified that she has never met Mother before.

### 4.      *The Court's Order Terminating Reunification Services*

On December 1, 2020, the juvenile court considered the evidence and ordered reunification services terminated for Mother and Father and set a selection and implementation hearing pursuant to section 366.26 for March 25, 2021.

The juvenile court found by a preponderance of the evidence that returning the minor to Father would create a substantial risk of harm to the minor's safety, protection, and physical and emotional well-being.[14] The court found that another instance of domestic violence between Mother and Father had occurred on June 13. The court reasoned that Father had "not exhibited adequate insight and accountability regarding his actions, including the fact that he appears to deny that the June 13, 2020, incident even

---

[14] The court made the same risk-of-harm finding regarding the minor's return to Mother.

16

took place." It concluded further that Father, based upon his positive test for cocaine in late June and his having missed many tests, had not shown substantial progress in connection with the substance abuse component of his case plan. Further, the juvenile court found by clear and convincing evidence that the Department had provided reasonable services to Father. And the court concluded that there was not a substantial probability that the minor would be returned to the physical custody of either Father or Mother within 24 months of the initiation of protective custody.

### III.   DISCUSSION

Father presents two main arguments in challenging the juvenile court's order terminating reunification services. First, Father argues that the court erred in concluding that there was substantial evidence that returning the minor to his custody would create a substantial risk of harm to the child. He argues further that the juvenile court denied him due process by conditioning his proposed testimony upon his counsel first making an offer of proof.

### A.   Applicable Law

When the dependent child is removed from parental custody, the juvenile court is ordinarily required to provide the parent with services to facilitate the reunification of the family. (§ 361.5, subd. (a); see *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 303.) As explained by one court: "The importance of reunification services in the dependency system cannot be gainsaid. The law favors reunification whenever possible. [Citation.] To achieve that goal, ordinarily a parent must be granted reasonable reunification services. [Citation.]" (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

Prior to the 366.26 hearing, there are periodic status reviews as ordered by the court, but not less frequently than every six months. (§ 366, subd. (a)(1).) Under section 366.21, subdivision (e)(1), at the six-month review hearing, the juvenile court must return the child to the parents' physical custody "unless the court finds, by a

17

preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." The agency bears the burden of establishing such detriment. (*Ibid.*) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Ibid.*) Because they are conducted at a stage when the juvenile court may deny further reunification services to the parent, "[r]eview hearings are critical." (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 61.)

At the review hearing, the juvenile court may continue the case for up to six months for a permanency review hearing as long as that hearing occurs within 18 months of the child's removal. (§ 366.21, subd. (g)(1).) The court may do so, however, "only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (*Ibid.*) The court's finding that there is a substantial probability that the child will be returned to the home constitutes "a compelling reason for determining that a hearing held pursuant to Section 366.26 is not in the best interests of the child." (§ 366.21, subd. (g)(1)(C)(i).) In any event, "[t]he court shall not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." (§ 366.21, subd. (g)(1)(C)(ii).) The Department bears the burden of proving by clear and convincing evidence that it provided or offered reasonable reunification services to the parent. (§§ 366.21, subd. (g)(1)(C)(ii); 366.22, subd. (a)(3).)

Section 361.5, subdivision (a) provides in pertinent part: "For a child who, on the date of initial removal from the physical custody of the child's parent . . . , was under three years of age, court-ordered services shall be provided for a period of 6 months . . . but no longer than 12 months from the date the child entered foster care . . . .

18

[¶] . . .[¶] . . . [C]ourt-ordered services may be extended . . . not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent . . . . The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of the child's parent . . . within the extended time period or that reasonable services have not been provided to the parent." Based on a child's need for security and stability, the 18-month review hearing is the cutoff date for family reunification services. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788.) "At this hearing, the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children. [Citation.]" (*Ibid.*)

The juvenile court may offer more than 18 months of reunification services if it finds that reasonable reunification services have not been offered or provided. (*In re M.F.* (2019) 32 Cal.App.5th 1, 21.)[15] At the conclusion of the review period, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (§ 366.22, subd. (a).)

## B. Standard of Review

We review the court's findings here at the combined 12-month/18-month review hearing for substantial evidence. (See *J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535 [12-month review hearing]; *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598 [18-month review hearing].) A finding by the juvenile court that the return of the child to parental custody would be detrimental to the child is also reviewed for substantial evidence. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483; *In re Shaundra L.* (1995)

---

[15] Father does not assert that the juvenile court erred in finding by clear and convincing evidence that the Department provided or offered reasonable services to him.

33 Cal.App.4th 303, 318.)  In reviewing the challenged findings, we examine the record in the light most favorable to the juvenile court's order, to determine whether there is substantial evidence from which a reasonable trier of fact could have made the requisite findings.  (*In re Mary B.*, *supra*, at p. 1483.)  We construe all reasonable inferences and resolve all conflicts in favor of the court's findings.  (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)  Issues of fact and credibility are the sole province of the juvenile court.  (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 (*Constance K.*).)

### C.    Noncompliance With California Rules of Court

Father's petition is replete with statements describing purported facts and procedural background of the case that are unsupported by any citation to the record.  These unsupported statements include purported testimony of witnesses, accounts by Mother to the police and social workers regarding the June 13 incident, accounts by Father and others to social workers regarding the June 13 incident, and comments by the juvenile court.  By this court's approximate count, Father presents over 70 references to specific testimony, facts contained in the Department's reports, and procedural matters that are without any supporting citations to the record.[16]

The failure to provide proper citations to the appellate record—here, to either the clerk's or reporter's transcript—supporting matters referred to in the court below violates court rules.  (See rule 8.204(a)(1)(C) [matters referenced from the record in appellate briefs must be supported "by a citation to the volume and page number of the record where the matter appears"].)  " 'Any statement in a brief concerning matters in the

---

[16] Father in his petition also asserts facts concerning his alleged compliance with elements of his case plan *after* the termination of services.  We will not consider these purported facts both because they are unsupported by citations to the record (see rule 8.204(a)(1)(C)), and because they are, by their very nature, matters outside of the record since they allegedly took place after the entry of the order challenged in the petition.  (See *Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 102 ["Factual matters that are not part of the appellate record will not be considered on appeal and such matters should not be referred to in the briefs."].)

appellate record—whether factual or procedural and no matter where in the brief the reference to the record occurs—*must be supported by a citation to the record*.' [Citation.]" (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970, original italics.)  The appellate court may disregard any contentions made without citation to the record supporting them.  (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239; see also *In re S.C.* (2006) 138 Cal.App.4th 396, 406 [appellate court is not required to search the record to discover support for litigant's position].)

Although we do not minimize the importance of a party's obligation to provide proper citations to the appellate record in support of his or her position, and in this instance we could choose to deem Father's claims of error based upon his unsupported argument forfeited, we will nonetheless, in the interests of justice, address Father's first claim of error, i.e., that the juvenile court erred in finding that return of the minor to Father's care would create a substantial risk of harm to the minor's safety, protection, and physical and emotional well-being.

### D.	Substantial Risk of Harm

The juvenile court concluded that returning the minor to Father would create a substantial risk of harm to the minor's safety, protection, and physical and emotional well-being.  Father contends that there was no substantial evidence to support the court's conclusion.  His focus is on two matters relevant to the substantial-risk-of-harm finding (detriment finding), namely, (1) Father's role in the June 13 incident, and (2) Father's substance abuse issues.

#### 1.	*June 13 Domestic Violence Incident*

With respect to the June 13 incident, Father's argument is founded entirely on the premise that Mother's account of the incident—the details of which as presented in the petition by Father are almost entirely without supporting citations to the record—was not credible and that the domestic violence she claimed Father inflicted upon her thus did not occur.  He emphasizes that Mother's account of the June 13 incident varied, and that she

21

"told different stories to different people about the events of that day." Father argues that Mother is an untrustworthy witness, and that she "ha[d] a history of deception and manipulation throughout the case."[17] He contends that the court in fact "characterized her as a 'dishonest person.' "[18] Father in his petition contrasted Mother's purported "different stories" about the June 13 incident with his own denials to the Department that he had had any contact with Mother on June 13. Father therefore challenges the juvenile court's decision to terminate his services that was based partially upon the June 13 incident.

Father's position lacks merit. First, his argument ignores specific matters in the record that are unfavorable to his assertion that the June 13 incident should have been discounted because of Mother's "different stories" and claimed lack of veracity. Father himself—who did not testify under oath to specifically deny that he had physically assaulted Mother on June 13—gave at least five different accounts of what transpired on June 13. At various times, Father told the Department that on the morning of June 13, he had (1) taken the minor to his sister's home; (2) left his home with the minor on foot to attend a virtual AA/NA meeting while walking around the neighborhood; (3) taken the minor to breakfast; (4) not taken the minor to breakfast, had not left with the child in his car, but he had prepared a sandwich for her; and (5) never left the house with the minor.

[17] Father, again in violation of rule 8.204(a)(1)(C), makes this sweeping statement without a reference to the record that supports the assertion. We acknowledge, however, as we noted in *In re T.G*, *supra*, H046914, that Mother had made various inconsistent and contradictory statements about incidents of domestic violence between 2016 and August 2018 (before the filing of the dependency petition), including her admission at the jurisdiction and disposition hearing that she had lied to the police about having been physically assaulted by Father in August 2018.

[18] Father does not cite to the record where the juvenile court supposedly made this statement. (See rule 8.204(a)(1)(C).) But we are aware that the court, when it announced its decision on May 3, 2019, after the jurisdiction/disposition hearing, observed that it felt that " '[Mother] is herself not a truthful person,' " and it had " 'trouble giving any credibility to [Mother].' " (*In re T.G.*, *supra*, H04914 [pp. 27, 28].)

And we note that of the five accounts given by Father, the first one—that he had taken the minor by car to the house of Father's sister on the morning of June 13—was corroborated by the paternal uncle, D.L. D.L. told the Department that, after finding the minor absent when he awakened on June 13, he called Father, who said he was at his sister's house with the minor; D.L. said that Father returned by car within 20 minutes to drop off the minor.[19] Father, in challenging the sufficiency of the evidence, "was not free to ignore facts that support" the juvenile court's detriment finding. (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1152 [appellate court finds mother waived argument concerning the jurisdictional finding that she had not provided adequate medical care to children by her failure to present evidence that supported the finding]; see also *James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021 "[[e]vidence not favorable to the petitioner cannot be simply ignored as if it does not exist"].)

Second, and more fundamentally, Father's challenge to the juvenile court's reliance upon the June 13 domestic violence incident to support its detriment finding is, implicitly, an attack upon the court's assessment of the evidence and the credibility of the witnesses. The juvenile court, in making its detriment finding as to Father, specifically found from its consideration of the evidence that the June 13 domestic violence incident, in fact, occurred. The court concluded that it believed Mother's testimony that she was the victim and not the aggressor in the incident. The court found that Father had "not exhibited adequate insight and accountability regarding his actions," including the fact that he had denied that the June 13 incident had occurred. The juvenile court observed that "[Father's] inconsistent accounts of what happened that day as well as his alibi that he was attending his 52-week class . . . lack credibility and [Father] has not presented any

---

**19** We also note that D.L., who would seemingly have no reason to be untruthful, reported to Department social worker Hall that Father had contacted him later on June 13 "to say that he took the child for a walk and did not leave with her in his vehicle, . . . inform[ing D.L.] that . . . it would be [Father's] word against [D.L.'s] word as to what took place."

23

plausible, alternative explanation for what happened." These findings were supported by substantial evidence, and it is readily apparent that the juvenile court based its conclusions from its assessment of all the evidence, including an assessment of the credibility of the witnesses, finding that Mother's testimonial account concerning the June 13 incident to be more credible than Father's reports about it to the Department. It is not within our purview to reweigh the evidence or to assess the credibility of the witnesses. (See *Constance K.*, *supra*, 61 Cal.App.4th at p. 705; *In re Joseph B.* (1996) 42 Cal.App.4th 890, 901 [appellate court defers to juvenile court's witness credibility determination relative to detriment finding].)

### 2. *Father's Substance Abuse Issues*

Father also challenges the juvenile court's reliance upon Father's ongoing substance abuse issues as a basis for its detriment finding. He argues that "the law does not require perfect parenting before a parent may regain custody of a dependent child," and that, while it would have been better had Father never used cocaine at all, there was no showing that he used or was under the influence of drugs in the minor's presence. Father asserts further that his "single positive test for cocaine during the reporting period does not provide substantial evidence of detriment."

Initially, we observe that Father has twice misrepresented the record in his petition. He argued that there was a "single positive test," and that since he tested positive for cocaine on June 22, 2020, "[t]here have been no further positives between that date up to December 1." This argument ignores the fact that Father also tested positive for cocaine on September 15, 2020, less than two weeks before the commencement of testimony in the 12-month/18-month review hearing.

Moreover, Father's contention erroneously assumes that the substance abuse issue of concern to the court was limited to positive drug tests. Based upon the collective testimony of Nguyen and Matsushima, the Department's concern about Father's ongoing substance abuse issues included, in addition to the positive tests, a pattern of Father's

24

missing scheduled drug tests, and his inconsistent participation in AA/NA meetings. Father reportedly attended only 15 AA/NA meetings in the three months between July and September 2020. And Father reported in mid-September that he had not been in contact with his sponsor. Additionally, Department reports indicated that, between June 29 and November 2, 2020, Father had missed 12 scheduled drug tests. The evidence of two positive tests for the same drug (cocaine) that resulted in Father's arrest in November 2019 for driving under the influence, coupled with missed tests, caused the juvenile court to conclude that Father had not made substantial progress with respect to the substance abuse component of his case plan.[20]

Based upon the record, we reject Father's claim that the juvenile court improperly concluded that Father's ongoing substance abuse issues presented a reason for its detriment finding. There was substantial evidence to support the court's conclusion that Father had not made substantial progress with respect to this element of his case plan.

### 3. Conclusion Concerning Detriment Finding

A parent's substantial compliance with a reunification services plan does not preclude a finding that the child would suffer detriment if returned to the parent. (*Constance K.*, *supra*, 61 Cal.App.4th at p. 704.) "[T]he court must also consider progress the parent has made toward eliminating the conditions leading to the children's placement out of home." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141-1142.)

Here, while Father is to be commended for the significant efforts made in complying with his case plan, his participation as the aggressor in the June 13 domestic violence incident—an incident that the juvenile court found to have, in fact, occurred— was a significant basis for the juvenile court's detriment finding. This is particularly true

---

[20] We acknowledge that the juvenile court in the announcement of its decision referred only to the June 2020 positive drug test. The fact remains that the record shows that Father tested positive for cocaine a second time in September 2020, shortly before the commencement of the combined 12-month/18-month review hearing.

in light of the fact that the existence of substantial domestic violence involving the parents was the principal reason the minor became a dependent child. The court's finding was supported further by Father's ongoing issues with substance abuse, including numerous scheduled tests that were missed and two positive tests for cocaine less than three months apart. The juvenile court's finding that the return of the minor to Father's care would create a substantial risk of detriment to the minor was supported by substantial evidence. (*In re Mary B.*, *supra*, 218 Cal.App.4th at p. 1483.)

### E. Due Process

Father argues that he was denied due process because at the end of the proceedings, the juvenile court required that his counsel present an offer of proof as to the nature of Father's testimony were he to take the stand as a witness. He asserts that in the last 15 minutes set aside for testimony, when counsel proposed calling Father as a witness, but first asked to speak with his client, the juvenile court denied that request and "demanded an offer of proof as to what the testimony would be." Father asserts that his counsel, faced with having to respond to the court's request that he confirm that he wanted to call his client to testify without first consulting him about it, "finally told the court that he would submit on the record, not wanting to further antagonize the court."

Father's due process argument—again, in violation of rule 8.204(a)(1)(C)—includes no citations to the relevant record.[21] The reporter's transcript of the four half-days of testimony consists of approximately 400 pages. It is not this court's obligation to review the entire record to confirm that the petitioner's statements made concerning the proceedings are accurate. "When [a petition for extraordinary writ] makes no reference to the pages of the record where a point can be found, an appellate court need not search

---

[21] Father's petition includes one citation to the record, which is to a matter not relevant to his due process argument—involving the court's having commented on Mother's witness, Michelle Ho, taking " 'well over an hour' " rather than the 15 minutes originally estimated.

through the record in an effort to discover the point purportedly made.  [Citations.]  We can simply deem the contention to lack foundation and, thus, to be forfeited."  (*In re S.C.*, *supra*, 138 Cal.App.4th at pp. 406-407.)

Moreover, "[a] party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.]"  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222; see also *Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1101 ["constitutional issues not raised in earlier civil proceedings are waived on appeal]; *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [failure to assert evidentiary objection below on basis that admission of evidence violated defendant's constitutional rights forfeited].)  A key rationale for the forfeiture doctrine " 'is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.' [Citation.]"  (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1 (*Doers*), original italics.)  This principle that claims unpreserved at the trial level are forfeited on appeal "has been applied in dependency proceedings in a wide variety of contexts."  (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398.)

Father did not raise an objection below that the juvenile court, in purportedly requiring his counsel to make an offer of proof in lieu of Father's testimony and purportedly conditioning such testimony upon an offer of proof, violated his right to due process.[22]  Had he done so, the juvenile court could have readily addressed whether it was, or was not, proceeding fairly in addressing counsel's equivocal request to call Father as a witness within the last 15 minutes of the fourth day set aside by the court for the

---

[22] We have reviewed the transcript from the fourth day of the hearing to confirm that Father did not assert a due process objection below. Additionally, in stating that Father contends that the juvenile court conditioned allowing his testimony upon first presenting an offer of proof, we only acknowledge that this is Father's argument; we do not necessarily agree that the record supports that assertion.

evidentiary hearing in the instant dependency proceeding.[23]  It is thus apparent that a defect, if any, " 'could easily have been corrected at the trial.' [Citation.]" (*Doers*, *supra*, 23 Cal.3d at pp. 184-185, fn. 1.)  Therefore, Father—aside from having forfeited his contention by failing to provide supporting citations to the record (*In re S.C.*, *supra*, 138 Cal.App.4th at pp. 406-407)—has forfeited the argument in his petition by not asserting it below.  (*In re Dakota H.*, *supra*, 132 Cal.App.4th at pp. 221-222.)

### F.    Conclusion

As a result of the filing of *R.L.*, *supra*, H04850, the juvenile court has been directed to vacate the 366.26 hearing and to provide Mother with additional reunification services.[24]  We observe that—depending on the current circumstances, including the extent to which Father, since December 1, 2020, has demonstrated a commitment to addressing the issues that caused the juvenile court to have found the minor to be a dependent child—the law may permit, either through a stipulation or the filing of a petition under section 388, an additional period of services to Father.  But based upon the record before us, the juvenile court here did not err in terminating Father's services at the 12-month/18-month review hearing.

### IV.    DISPOSITION

The petition for an extraordinary writ is denied.

---

[23] The juvenile court originally reserved three days for the hearing.  But after commenting on several occasions about the pace of the testimony, at the end of the second day, the court added a fourth day of testimony.  At that time, the court asked that Father's counsel submit a list of witnesses with time estimates.  It did so because Father's counsel had not previously filed a witness list, as had counsel for the Department and Mother  At the end of the second day, as well as the end of the third day, Father's counsel expressed uncertainty as to whether Father would even be called as a witness to testify.  And toward the end of the third day, in response to the court's question as to whether he planned to call any witnesses, Father's counsel stated, "I have another witness [C.S.], and possibly my client."  After C.S.'s short testimony was completed, Father's counsel stated, "I think I would like to call my client."

[24] Therefore, to the extent Father has requested in his petition that a stay issue and that the 366.26 hearing be vacated, the petition is denied as moot.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

ELIA, J.

*M.L. v. Superior Court*
**H048951**